STRAWN *v.* STATE.

4208                                          151 S. W. 2d 988

Opinion delivered June 16, 1941.

*Howard Hasting,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, C. J.   Charlie Strawn, a mill worker forty-six years of age, killed his wife in circumstances which caused a jury to find him guilty of first degree murder.   The death penalty was assessed.

This appeal questions the trial court's action in giving certain instructions, in refusing to give other instructions, in admitting evidence relating to prior crimes it was intimated the defendant had committed, and in permitting the prosecuting attorney to argue the case in an inflammatory manner.

Our conclusion is that the only error occurred when the court instructed on murder in the first degree, malice and premeditation not having been shown by substantial evidence.

Appellant, at the age of eighteen, married Nellie Vance, who at that time had a three-year-old illegitimate

son. Five children were born to Nellie and her husband, three of whom survive.

The prosecuting attorney, as expositor of appellant and his family, drew comparisons to "wolves, rats, dogs, and other lower animals." The record points with certitude to family life devoid of moral integration. Husband and wife were addicted to drink. Profanity and foul language were the usual media of communication. The children had grown so accustomed to turmoil that they gave but little heed if mother or father merely swore at the other, or if in accent tinctured with verbal venom they invoked an alliance with unseen powers in aid of a purpose to damn.

A neighbor spoke of Nellie as a hellcat who, knowing of a murder her husband had committed, used threats of exposure as a means to an end. Fighting seems to have been engaged in as an outlet for strange emotions, while alcoholic beverages contributed their potentials in provoking controversy and creating false courage.

Ed Strawn, a married son of appellant, at whose home the drama of death was enacted, did not sense a note of seriousness when his father and mother exchanged maledictions for imprecations; nor was he emotionally disturbed by the victim's screams, for evidence is that he left the comfort of his bed only when urged to do so— and this did not occur until his mother's struggles had ceased. The only substantial service rendered by this young man consisted in a casual direction to his father not to strike the prostrate woman with a stick; and then, upon discovering that the conflict had been more brutal than usual, he carried his dead mother into the house and called a doctor. A short time later, after the body had been taken to an undertaking establishment, this unusual son retired to the bed from which his mother's corpse had just been removed, and when officers arrived three hours later he was sleeping so soundly that difficulty was experienced in arousing him.

Appellant's testimony is a composite of native shrewdness prompted by the natural law of self-preservation, and an apparent frankness indicating an absence

of malice. It negatives the state's contention that the crime was premeditated. Charlie Webb, only eye-witness to the fight, testified that appellant replied to a statement that he had killed Nellie: "Hell, no; it will take more than that to kill her." When appellant was asked why (in view of testimony that Mrs. Strawn was usually the aggressor when difficulties arose) he did not leave his wife, the reply was, "She had raised me a family."

Two physicians testified the decedent's neck had been broken; that fractured vertebrae were shown by X-ray films. Another physician thought differently. There was a bruise on the head, with indentation, but neither the skin nor the skull had been broken. Testimony was that Mrs. Strawn struck appellant with a rock; that the fight occurred on the front porch of Ed Strawn's home; that two or three hairs resembling those of the dead woman (and fabric from her dress) were found on a piece of "two by four" timber, this being the stick held by appellant when the son directed that it be not used. The witness Webb, when about a hundred yards from the house, saw appellant and his wife "go together." There is this testimony: "Appellant slapped his woman three or four times. She was screaming like she was screaming for her life. She fell. I don't know whether Charlie knocked her down, or she fell in the scuffle. After she got down she 'hollered' about once and quit right at one time. He went down on the ground with her and struck her three or four licks. I walked within nine steps of them, but I just kept walking."

Appellant, after describing preliminary movements of the family, testified: "My wife was cursing and foaming, and her face was red. I have seen her have lots of mad spells that way, and didn't pay any attention. We walked up to [Ed's] house. I started to open the door. [My wife] was right behind me, jerking, 'hollering,' and shouting. It was just as I reached the door she hit me with something, but it was not a hard lick. I turned around and she was spewing and sputtering. . . . I pushed her back. She was hysterical. . . . She got me at the bib of the overalls and I never did push her loose. About that time I pulled backward off the little

porch. There were some [cut-offs from the mill, used for fuel] scattered around out there; some 'two-inch,' some 'one-inch,' and some 'ship-lap.' We stumbled around with her holding to my overalls—stumbled off the little porch and kept going backward until we were in the pile of cut-offs, and fell. She hit on her left side and I went across her. I got up and picked up that stick. Ed was standing there in his B. V. D.'s and he said, 'Dad, throw that stick down; you ain't going to hit her with that.' She was not screaming, so I dropped the stick and went on in the house.''

If it should be said that circumstantial evidence supports a theory that appellant used the "two-by-four" as a club, it may also be said that the disinterested eye-witness, Webb, who was called by the state, testified that appellant only used his fists. It is equally clear that Mrs. Strawn's neck could have been broken by the fall, and this possibility would be greater if appellant's body fell upon her. Other witnesses testified to conditions of intermittent belligerency existing between the couple. While it was competent for the jury to find that death was produced by the beating administered, we think the record fails to disclose a murderous intent. Appellant's statement that "It would take more than that to kill her," while abhorrent and repulsive, indicates he did not think Mrs. Strawn was dead; and the practice of fighting, both formally and informally, had created in the minds of the participants a blurred psychology in accord with the husband's wanton conduct—a concept quite difficult for orderly minds to comprehend, yet a condition for which society is in a measure responsible.

Because of the court's error in instructing the jury as it did (the elements of premeditation and deliberation not having been proved) the judgment will be modified by substituting second degree murder for murder in the first degree, the sentence to be 21 years in the penitentiary. As modified, the judgment is affirmed. It is so ordered.